Filed 10/10/14  P. v. Prado CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064289 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD241085) |
| JUAN ALBERTO PRADO et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant Juan Alberto Prado.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant James John Rivas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants Alberto Prado and John Rivas of three counts of premeditated attempted murder (Pen. Code, §§ 664/187, subd. (a), 189)[1] involving three victims: Mr. Monroe (count 1), Mr. Moats (count 2) and Mr. Slaughter-Cook (count 3). The jury also found true Rivas personally used a knife in count 1 and Prado personally used a knife in counts 2 and 3 (§ 12022, subd. (b)(1)), and that Rivas personally inflicted great bodily injury in count 1 and Prado personally inflicted great bodily injury in count 3, within the meaning of sections 12022.7, subdivision (a), and 1192.7.[2]

On appeal, defendants contend the judgment must be reversed as to all counts because the instruction on attempted murder was prejudicially erroneous by equating the aider and abettor's so-called "direct act" with his intent. Prado also contends the "natural and probable consequences" portions of the aider and abettor instructions were erroneous under *Alleyne v. United States* (2013) ___ U.S. ___ [133 S.Ct. 2151] (*Alleyne*) and/or *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). Finally, Prado contends the instructions inadequately informed the jury it could find him guilty of aiding and abetting attempted voluntary manslaughter.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     The jury also convicted defendants of one count of assault with a deadly weapon as to the victim Slaughter-Cook (count 4) and, in a bifurcated proceeding, Prado and Rivas admitted the truth of certain allegations of prior prison terms, prior serious felonies and prior strike convictions. The present appeal raises no issues as to these convictions and true findings.

I

FACTS

In the early morning hours of May 25, 2012, a group of homeless people, including Messrs. Monroe, Moats, Slaughter-Cook and Parker, were sleeping near the San Diego Public Library when they were awakened by Rivas, who was mumbling to himself and banging a stick on an iron fence across the street. Slaughter-Cook yelled at Rivas to "shut the fuck up" and Rivas yelled back at him. Monroe, Slaughter-Cook and Parker crossed the street and confronted Rivas, and an altercation ensued during which Slaughter-Cook punched Rivas, causing him to fall to the ground, and the others tried to kick and punch Rivas. He was able to get to his feet, stated "you did me dirty, I'll be back," and left. Monroe, Slaughter-Cook and Parker then returned to their sleeping spot.

Approximately 15 minutes later, Rivas returned to the library with Prado. Parker heard one of them say, "That's him in the white blanket," and saw Rivas and Prado (each holding a knife in his hand) walk up to Moats and start trying to stab him through the blanket.[3] Moats got out of his blankets, screaming they had the wrong person and asking what he had done, and Prado responded "you did something to my friend." Prado swung a hooked knife at Moats; Parker came to Moats's aid and tried to disarm Prado.

Meanwhile, Slaughter-Cook was awakened by Monroe's screams that "they're stabbing me." Slaughter-Cook heard Rivas tell Monroe "you did me dirty, I'm going to kill you," and saw Rivas (straddling Monroe as he lay on the ground in a sleeping bag)

---

[3] The blanket protecting Moats was a thick, quilt-like blanket, and Moats testified it sustained multiple puncture holes during the attack.

3

making downward motions with the knife at Monroe's upper body. Slaughter-Cook ran to aid Monroe and kicked Rivas, then grabbed him from behind and tried to wrestle the knife from his hand. He punched and bit Rivas and the two men wrestled to the ground. Prado then ran up to Slaughter-Cook and stabbed Slaughter-Cook in the back. Slaughter-Cook told his friends to "handle the dude" that had stabbed him.

As Slaughter-Cook struggled with Rivas, Parker and Moats grabbed Prado and, after Monroe joined the fray, they were able to disarm Prado. Slaughter-Cook was then able to strike Rivas several times, disarming him before he fled. Slaughter-Cook threw the knife toward the library. Meanwhile, Prado asked the men to let him leave because the police would be coming. When they released him, Prado also fled. Slaughter-Cook called 911.

When officers arrived, the group gave the officers one knife and directed them to the front of the library, where they found a second knife. Blood and DNA on the knives belonged to Slaughter-Cook and Monroe. Slaughter-Cook had a stab wound in his back and had trouble breathing because of a collapsed lung. Monroe had a stab wound to the upper left arm and a cut on his head. Moats had cuts on his hands along with other injuries.

II

ANALYSIS

A. <u>CALCRIM No. 600 Adequately States the Applicable Principles</u>

Defendants first claim all of the convictions must be reversed because the jury was given a modified version of CALCRIM No. 600 on attempted murder and the instruction was prejudicially incorrect. The trial court's instruction provided:

> "To prove that a defendant is guilty of attempted murder, the People must prove one, the defendant took at least one direct but ineffective step toward killing another person and, two, the defendant intended to kill a person. [¶] . . . [¶]
>
> "A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. [¶] *A direct step indicates a definite and unambiguous intent to kill.* It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt." (Italics added.)

The first paragraph of the instruction correctly states the law (*People v. Lee* (2003) 31 Cal.4th 613, 623 ["Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."] (*Lee*)) and defendants do not contend otherwise. Instead, they contend the italicized language in the second paragraph was prejudicially incorrect because it in effect instructs the jury that a direct step equals an intent to kill, and therefore once the jury found the "direct step" element, they would not need separately to determine the "intent" element.

5

Defendants acknowledge this identical argument was rejected by the court in *People v. Lawrence* (2009) 177 Cal.App.4th 547, but argue we should not follow *Lawrence* because it was wrongly decided. The *Lawrence* court, rejecting the same argument, concluded the challenged language was substantively identical to the language approved by the Supreme Court in *People v. Dillon* (1983) 34 Cal.3d 441, 452-453, and also explained:

> "When the challenged portion of CALCRIM No. 600 is considered in context, it is clear there is no reasonable likelihood jurors understood it as appellant asserts. [Citations.] The instruction as a whole makes it clear that in order to find an attempt, the jury must find two distinct elements: an act and an intent. These elements are related; usually, whether a defendant harbored the required intent to kill must be inferred from the circumstances of the act. [Citation.] Read in context, it is readily apparent the challenged language refers to the act that must be found, and is part of an explanation of how jurors are to determine whether the accused's conduct constituted the requisite direct step or merely insufficient planning or preparation." (*Id.* at p. 557.)

We agree with *Lawrence* that, viewed in context of both the instruction itself and the entire charge to the jury, CALCRIM No. 600 adequately instructed the jury there were two elements (the mens rea and the actus reas) the jury needed to separately determine, and the italicized language referred to the latter element and was part of explaining how jurors were to determine whether defendants' conduct constituted the requisite direct step as distinguished from mere insufficient planning or preparation.

B. Any Alleged Deficiency in the Aider and Abettor Instructions Was Harmless

Prado argues the aider and abettor instructions, insofar as those instructions enabled the jury to employ the "natural and probable consequences" doctrine to convict

6

him of aiding and abetting Rivas's attempted *premeditated* murder under section 654, subdivision (a), as permitted under *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*), were prejudicially erroneous because the rationales of *Alleyne, supra,* ___ U.S. ___ [133 S.Ct. 2151] and *Chiu, supra,* 59 Cal.4th 155 have undermined the continued vitality of *Favor*.[4] Prado acknowledges that, under the majority opinion in *Favor*, the jury was properly instructed and could properly convict him of attempted premeditated murder under the natural and probable consequences doctrine. However, Prado asserts that, after *Alleyne* and *Chiu*, a jury can never convict an aider and abettor of the nontarget offense of attempted *premeditated* murder under the natural and probable consequences doctrine, but instead may only convict the aider and abettor of attempted *second degree* murder under that doctrine. Prado alternatively asserts at a minimum that, after *Alleyne*, a jury cannot convict an aider and abettor of the nontarget offense of attempted premeditated murder under the natural and probable consequences doctrine unless the jury is instructed

---

[4]    Rivas does not raise these claims as to his own convictions, except insofar as he generically states that he "joins in all arguments raised by [Prado] which may accrue to [Rivas's] benefit, and are not inconsistent with the above arguments raised by [Rivas]." In an analogous case involving aider and abettor principles, the court in *People v. Nero* (2010) 181 Cal.App.4th 504, 510, footnote 11 observed that "[a]lthough Nero, in his reply brief, joined in the arguments advanced by Brown, he did not supply any additional argument on the issue of aider and abettor liability as it applied to his unique circumstance. Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations]. To the extent Nero's cursory joinder was an attempt to raise the aider and abettor issue, his reliance solely on Brown's arguments and reasoning is insufficient to satisfy his burden on appeal. We therefore consider the aider and abettor issue only as to Brown." Similarly, Rivas makes no effort to show either the instructions were erroneous under the facts as to his conduct, or how he was prejudiced by such alleged error. Accordingly, we consider the aider and abettor issues raised by Prado only as to Prado's convictions.

it must first find the premeditated murder was a natural and probable consequence of the target offense and, because the jury was not so instructed in this case, reversal of his convictions is required.

    1. *The Legal Landscape of Aider and Abettor Liability: Favor, Alleyne & Chiu*

    *Favor*

An aider and abettor may be convicted for crimes committed by the direct perpetrator under two alternative theories: direct aiding and abetting principles and the natural and probable consequences doctrine. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.) Under direct aiding and abetting principles, the defendant is guilty of the intended (or target) offense if he or she acted with knowledge of the criminal purpose of the direct perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the target offense. (*Id*. at p. 1118.) However, an aider and abettor can also be guilty of unintended crimes under the natural and probable consequence doctrine: when the aider and abettor acts with knowledge of the criminal purpose of the direct perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the target offense, he or she is guilty of both the intended crime and any other offense (the nontarget offense) committed by his or her confederate that was a "natural and probable consequence" of the target crime that he or she aided and abetted. (*Id*. at p. 1117.)

In *Favor, supra*, 54 Cal.4th 868, the court examined whether an aider and abettor who knew of and intended to facilitate the target offense of robbery could be convicted of the nontarget offense of attempted *premeditated* murder under the natural and probable

8

consequences doctrine if the direct perpetrator committed an attempted murder and such an attempted murder was a natural and probable consequence of the target crime, without the jury needing to find that *premeditation* also be a natural and probable consequence of the robbery, or whether the jury must be instructed that attempted *premeditated* murder (not just attempted murder) was a natural and probable consequence of the target offense. (*Id*. at p. 872.) The *Favor* court, relying on its earlier decisions in *People v. Bright* (1996) 12 Cal.4th 652 (*Bright*) (disapproved on other grounds by *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6) and *Lee, supra,* 31 Cal.4th 613, concluded that because section 664, subdivision (a), does not create different offenses of attempted premeditated murder and attempted unpremeditated murder, but is merely a penalty provision imposing a greater punishment for an attempt to commit a murder that is premeditated, the trial court need only instruct (as to aiders and abettors under the natural and probable consequences doctrine) that the jury must find the commission of *an* attempted murder was a natural and probable consequence of the target crime of robbery to affix liability for the ultimate crime on the aider and abettor, and premeditation is not a required component of the aider and abettor's mental state. Instead, *Favor* concluded because section 664, subdivision (a)'s penalty provision requires only that the attempted murder itself was willful, deliberate, and premeditated, it is only necessary the attempted murder be committed by one of the perpetrators with the requisite premeditation. Because the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder, *Favor* concluded that, "with respect to the natural and probable consequences doctrine as applied to the

9

premeditation allegation under section 664[, subdivision] (a), attempted murder—not attempted premeditated murder—qualifies as the nontarget *offense* to which the jury must find foreseeability. Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated." (*Favor,* at pp. 879-880.)

Thus, after *Favor*, it appears the jury assesses the aider and abettor's potential liability for the heightened penalties provided by section 654, subdivision (a), under the natural and probable consequences doctrine using a two-step inquiry: first, the jury evaluates whether *an* attempted murder (regardless of the actual perpetrator's premeditation) was a forseeable nontarget offense; if it so finds, the jury then separately determines whether the attempted murder was committed by the perpetrator with the requisite willfulness, deliberateness, and premeditation. If it find affirmatively on both inquiries, the aider and abettor is subject to the heightened penalties provided by section 654, subdivision (a), for attempted premeditated murder.

*Alleyne*

In *Alleyne, supra,* ___ U.S. ___ [133 S.Ct. 2151], the court expanded on its previous decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 in the context of a statutory scheme that imposed enhancements to a sentence for a defendant who "uses or carries a firearm" in relation to a "crime of violence." (*Alleyne,* at pp. 2155-2156.) Under the statute, the defendant must be sentenced to a term of not less than five years for that conduct, but also provided for a term of not less than seven years if the firearm

10

was brandished and a term of not less than 10 years if the firearm was discharged. (*Ibid.*) The jury found the defendant " '[u]sed or carried a firearm during and in relation to a crime of violence' but did not indicate a finding that the firearm was 'brandished.' " (*Id.* at p. 2156.) However, the trial court sentenced the defendant to seven years, concluding brandishing was not an element the jury was required to determine beyond a reasonable doubt but was instead a sentencing factor the trial court could find by a preponderance of the evidence. (*Ibid.*) The *Alleyne* court reversed, declaring *Apprendi* established that a fact "is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed" for purposes of the maximum term a defendant is to be punished, and *Alleyne* concluded this same definition applied to facts that also increase the mandatory minimum sentence. (*Alleyne*, at p. 2158.)

*Chiu*

In *Chiu, supra*, 59 Cal.4th 155, the court addressed whether an aider and abettor who knew of and intended to facilitate a target offense could be convicted of the nontarget offense of *premeditated* murder under the natural and probable consequences doctrine if the direct perpetrator committed premeditated murder and premeditated murder was a natural and probable consequence of the target crime. The Court of Appeal held it was prejudicially erroneous not to instruct the jury it was necessary to find the first degree premeditated murder actually committed by the perpetrator was a natural and probable consequence of the target offense, and therefore reversed the conviction. *Chiu* went further and held that, although an aider and abettor may be convicted of

11

premeditated murder under *direct* aiding and abetting principles, an aider and abettor cannot be convicted of the nontarget offense of first degree *premeditated* murder under the natural and probable consequences doctrine. (*Id*. at pp. 158-159.)

Chiu began by noting the court had not considered aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine. It acknowledged its decision in *Favor* held that, under the natural and probable consequences doctrine as applied to the premeditation allegation under section 664, subdivision (a), a trial court need only instruct that the jury find attempted murder (not attempted *premeditated* murder) was a foreseeable consequence of the target offense, and the premeditation finding (based on the direct perpetrator's mens rea) was to be determined after the jury decided the nontarget offense of attempted murder was foreseeable. However, *Chiu* explained *Favor's* analysis turned on the reasoning in *Bright, supra,* 12 Cal.4th 652 (which held § 664, subd. (a), imposed an increased punishment for an attempt to commit a premeditated murder, was a penalty provision and did not create a greater offense or degree of attempted murder) and in *Lee, supra,* 31 Cal.4th 613, which construed the language of section 664, subdivision (a), to evince a legislative intent to apply section 664, subdivision (a)'s enhanced penalties to all aiders and abettors (even those who did not personally act with premeditation) and reasoned the direct perpetrator's more culpable state of mind would be a sufficient basis upon which to apply section 664, subdivision (a)'s penalty provision to an aider and abettor under the natural and probable consequences doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 162-163.)

12

The *Chiu* court, however, rejected the government's argument to follow *Favor* and apply the same reasoning to an aider and abettor charged with premeditated murder. The *Chiu* court, explaining its grounds for distinguishing and not applying *Favor*, stated:

> "[*Favor* is] distinguishable in several respects. Unlike *Favor*, the issue in the present case does not involve the determination of legislative intent as to whom a statute applies. Also, unlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder. In reaching our result in *Favor*, we expressly distinguished the penalty provision at issue there from the substantive crime of first degree premeditated murder on the ground that the latter statute involved a different *degree* of the offense. [Citing *Favor, supra*, 54 Cal.4th at pp. 876-877.] Finally, the consequence of imposing liability for the penalty provision in *Favor* is considerably less severe than in imposing liability for first degree murder under the natural and probable consequences doctrine. Section 664[, subdivision] (a) provides that a defendant convicted of attempted murder is subject to a determinate term of five, seven, or nine years. If the jury finds the premeditation allegation true, the defendant is subject to a sentence of life with the possibility of parole. [Citation.] With that life sentence, a defendant is eligible for parole after serving a term of at least seven years. (§ 3046, subd. (a)(1).) On the other hand, a defendant convicted of first degree murder must serve a sentence of 25 years to life. (§ 190, subd. (a).) He or she must serve a minimum term of 25 years before parole eligibility. (§ 3046, subd. (a)(2).) A defendant convicted of second degree murder must serve a sentence of 15 years to life, with a minimum term of 15 years before parole eligibility. (§§ 190, subd. (a), 3046, subd. (a)(2).)" (*Chiu, supra*, 59 Cal.4th at p. 163.)

*Chiu* then articulated its reasons for concluding, as a matter of first impression, that an aider and abettor cannot be convicted of the nontarget offense of first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 163-167.) *Chiu* noted the natural and probable consequences doctrine is a common law doctrine "firmly entrenched in California law" (*id.* at p. 163)

13

but, because it is not part of the statutory scheme, the court "may . . . determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application." (*Id.* at p. 164.)

Chiu recognized that aider and abettor culpability under the natural and probable consequences doctrine "is vicarious in nature" because it is " 'not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Quoting *People v. Canizalez* (2011) 197 Cal.App.4th 832, 852]." (*Chiu, supra,* 59 Cal.4th at p. 164.) *Chiu* explained the natural and probable consequences doctrine is based on the principle that liability extends to reach " 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.' [Quoting *People v. Luparello* (1986) 187 Cal.App.3d 410, 439.]" (*Id.* at p. 164, italics added by *Chiu*.) *Chiu* concluded that, because the application of the natural and probable consequences doctrine does not depend on the foreseeability of every element of the nontarget offense but instead (at least in the context of murder under the natural and probable consequences doctrine) has focused on the reasonable foreseeability of the

14

*actual resulting harm*, "the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing . . . is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*Id*. at p. 165.)

*Chiu* declared that limiting aider and abettor liability under the natural and probable consequences doctrine to second degree murder is:

> "consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.] [¶] However, *this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder.* First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, *whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state*. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [quoting *Favor, supra*, 54 Cal.4th at p. 878], *the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and*

15

*probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence*." (*Chiu, supra*, 59 Cal.4th at pp. 165-166, italics added.)

However, *Chiu* cautioned that aiders and abettors could still be convicted of first degree premeditated murder based on *direct* aiding and abetting principles if the prosecution showed the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. Accordingly, *Chiu* turned to an examination of whether erroneously instructing the jury that an aider and abettor could be convicted of the nontarget offense of first degree premeditated murder under the natural and probable consequences doctrine was harmless error. *Chiu* applied the familiar principles that, "[w]hen a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.) *Chiu* ultimately concluded that, because the record showed the jury could have based its verdict on the erroneous natural and probable consequences doctrine, reversal was required.

### 2. *Prado's Arguments of Error*

Prado asserts that, even before *Chiu*, *Favor's* approach was of dubious validity because it rested on the analysis of *Bright, supra,* 12 Cal.4th 652, and *Lee, supra,* 31

Cal.4th 613, which viewed section 664, subdivision (a), as a penalty provision rather than as creating a distinct or different offense. He argues *Alleyne*, by eviscerating that distinction and requiring a jury to determine every element necessary to applying an enhanced penalty to a defendant, in effect determined the approach approved by *Favor* violated federal constitutional protections because *Favor's* approach permitted an aider and abettor to be punished for premeditated attempted murder without having the jury decide whether the aider and abettor personally premeditated an offense, or even whether the aider and abettor reasonably could have foreseen a nontarget offense encompassing premeditation.

More importantly, Prado urges us to recognize that the analysis employed by the *Chiu* court *applies with equal force* to aider and abettor liability for *attempted* premeditated murder under the natural and probable consequences doctrine. Although Prado acknowledges *Chiu's* discussion of *Favor* involved distinguishing (rather than expressly disapproving) *Favor*, Prado asserts the grounds articulated in *Chiu* for distinguishing *Favor's* treatment of aider and abettor liability for *attempted* premeditated murder under the natural and probable consequences doctrine cannot withstand serious scrutiny, and argues we should therefore construe *Chiu* as overruling *Favor* sub silencio and precluding of aider and abettor liability for attempted *premeditated* murder under the natural and probable consequences doctrine notwithstanding *Favor*.

3. *Any Error Was Harmless*

Prado presents cogent arguments that, considering *Chiu*, the jury was misinstructed on aider and abettor liability for attempted premeditated murder under the

17

natural and probable consequences doctrine. However, we conclude it is unnecessary to definitively determine whether *Chiu* overruled *Favor* sub silencio because, even assuming the jury was misinstructed on aider and abettor liability under the natural and probable consequences doctrine for the attempted premeditated murder of Monroe,[5] we are convinced beyond a reasonable doubt that any such purported error must be deemed harmless. (*Chiu, supra*, 59 Cal.4th at pp. 166-167.)

The jury was instructed on three separate theories for imposing liability on Prado for all of the murders: he could be guilty as a direct perpetrator of attempted premeditated murder; he could be guilty on "direct" aiding and abetting principles; and he could be guilty under the "natural and probable consequences" doctrine. As to Prado's liability for Rivas's attempted murder of Monroe, only the latter two theories were applicable

---

[5] On appeal, Prado principally argues the count involving Monroe (count 1) was based on the natural and probable consequences doctrine because Rivas was the attacker of Monroe, and Prado was not even charged with personal use of a knife in connection with that count. Although Prado also briefly asserts the prosecutor "proffered aiding and abetting as one theory of Prado's liability" on the other counts, the prosecutor primarily argued Prado was guilty of all counts as a direct perpetrator or under direct aiding and abetting principles, and the only evidence as to the count involving the attempted murder of Slaughter-Cook (count 3) was that Prado was the direct *and sole* perpetrator of that attempted murder, which convinces us beyond a reasonable doubt (and Prado offers no argument to the contrary) that the jury necessarily concluded Prado personally possessed the requisite mens rea as to that attempted murder. Moreover, as to the conviction for the attempted murder of Moats (count 2), the only evidence was (1) Prado was also a *direct* perpetrator of that attempted murder and (2) his personal attack on Moats *preceded* his later attack (on Slaughter-Cook), which the jury necessarily found *was* accompanied by the requisite premeditation. Prado offers no argument or view of the evidence demonstrating how a jury might have concluded Prado personally lacked premeditation when he first approached to begin his attack (on Moats) but thereafter premeditated as he continued his attack (on Slaughter-Cook). On this record, we are convinced beyond a reasonable doubt that the jury concluded Prado personally possessed the requisite mens rea as to both attempted murders as to which he was the direct perpetrator.

18

considering the evidence that Rivas, not Prado, was the direct perpetrator. The prosecutor, although explaining the natural and probable consequences doctrine was an available theory for holding Prado liable for the charged crimes, expressly stated and restated that the natural and probable consequences doctrine "isn't the People's theory of liability because we think . . . Prado had the intent to kill." The prosecutor emphasized the evidence showing Rivas's premeditated intent to kill in retribution for the victims' earlier assault on him, and noted Prado knew of and shared that intent because Prado (after being enlisted by Rivas) armed himself to accompany Rivas to exact retribution and, after Rivas identified the target (by saying, "That's him in the white blanket"), immediately joined with Rivas in approaching and trying to stab Moats. Indeed, the prosecutor noted that when Moats screamed they had the wrong person, Prado responded "you did something to my friend," evidencing Prado subjectively shared with Rivas the intent to extract revenge on the persons who had earlier attacked Rivas, one of whom was *Monroe*. Indeed, the prosecutor noted, when Rivas turned his attack away from the mistaken target (Moats) and attacked "the person he was meaning to attack" (Monroe), the prosecutor noted Prado *also* turned away from Moats and went several feet away to "protect[] . . . Rivas as [Rivas is] attacking Mr. Monroe" by stabbing Slaughter-Cook in the back when he tried to come to Monroe's aid.

We are convinced beyond a reasonable doubt, because of the evidence and the argument of the prosecutor, the jury found Prado liable for Rivas's premeditated attempted murder of Monroe under direct aiding and abetting principles because the evidence showed, and the prosecutor argued, that (1) Monroe was one of the persons

19

whom Rivas intended to target for retribution by trying to kill Monroe with planning and premeditation, (2) Prado knew of this intention and shared that purpose, and (3) Prado joined in the attack with the intent or purpose either of committing (or of encouraging or facilitating commission of) Rivas's premeditated attempt to kill Monroe. We are convinced beyond a reasonable doubt that the instruction as to the alternative natural and probable consequences doctrine, even if erroneous, was harmless error.

C. Any Alleged Deficiency in the Lesser Included Offenses Instruction Was Harmless

Prado contends the court erred when it did not sua sponte instruct the jury that attempted voluntary manslaughter was an option of which the jury could have convicted him under the natural and probable consequences theory, and that this error was prejudicial and requires reversal on all three counts.

*The Case Law*

An aider and abettor may be convicted of a greater crime than the crime for which the actual perpetrator is convicted. (*People v. McCoy, supra,* 25 Cal.4th at p. 1116.) Although we are cited no Supreme Court authority specifically determining whether a defendant can be guilty of a homicide-based offense of a *lesser* degree than that committed by the perpetrator under the natural and probable consequences doctrine, a series of cases have concluded a defendant can be guilty under the natural and probable consequences doctrine of a lesser crime than the perpetrator, and instruction on this principal is required in appropriate factual circumstances. This line of authority began with *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*). In *Woods*, two defendants

20

assaulted two people and stole some property. During the getaway, one of the defendants shot and killed the occupant of a nearby car. Both defendants were convicted of first degree murder. During deliberations, the jury asked if it could convict the accomplice of second degree murder even if the shooter was guilty of first degree murder, and the trial court responded in the negative. *Woods* held the trial court's response was erroneous because an aider and abettor may be found guilty under the natural and probable consequences doctrine of a lesser crime than that committed by the perpetrator, when the evidence suggests the ultimate crime was not reasonably foreseeable but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was foreseeable. (*Id*. at pp. 1577, 1586-1587.) *Woods* concluded that, under the facts of the case, the jury could have determined it was not reasonably foreseeable the codefendant would commit premeditated murder of an innocent bystander but it was foreseeable that he might kill intentionally but without premeditation, and therefore reversed as to the accomplice's premeditation. (*Id*. at pp. 1590, 1595-1596.)

*Woods* was followed, and extended by, the court in *People v. Samaniego* (2009) 172 Cal.App.4th 1148 (*Samaniego*).[6] In *Samaniego*, the court again held an aider and

---

[6] The rationale in *Woods* was also followed in, and extended by, the court in *People v. Hart* (2009) 176 Cal.App.4th 662 in the context of charged offenses more closely aligned with the present case, where both defendants were charged with and convicted of first degree *attempted* murder. The *Hart* court concluded the jury was not properly instructed on the natural and probable consequences doctrine because the instructions failed to inform the jury that to find the accomplice guilty of attempted premeditated murder, "it was necessary to find that attempted premeditated murder, not just attempted murder, was a natural and probable consequence of the attempted robbery." (*Id.* at p. 673.) *Hart* held the trial court had "a duty, sua sponte, to instruct the jury in a case

21

abettor's guilt may be less than the perpetrator's, but also concluded an instruction that informed the jury " '[a] person is *equally guilty* of the crime . . . whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation] [is] generally correct in all but the most exceptional circumstances" (*id*. at p. 1165), although under the peculiar facts of that case the court concluded it was potentially misleading and should have been modified. (*Ibid*.) However, *Samaniego* ultimately found the misinstruction to be harmless beyond a reasonable doubt because the jury necessarily found each of the defendants acted with the intent to kill (because the jury found a multiple murder special circumstance allegation to be true) and "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*Id*. at p. 1166.)

Finally, in *People v. Nero, supra,* 181 Cal.App.4th 504, defendant Nero stabbed the victim to death with a knife that the prosecution argued defendant Brown had handed to him. (*Id*. at p. 519.) During deliberations, the jury asked if it could find an aider and abettor guilty of a greater or lesser crime than the direct perpetrator, and the trial court replied that the principals in a crime are equally guilty. (*Id*. at pp. 511-513.) Both of the

---

such as this one that it must determine whether premeditation and deliberation, as it relates to attempted murder, was a natural and probable consequence of the target crime" (*ibid.*), and that it was prejudicial error not to inform the jury it could convict the accomplice of a lesser crime than the perpetrator under the natural and probable consequences doctrine. (*Id.* at pp. 672-674.) However, *Hart* was expressly disapproved in *Favor, supra*, 54 Cal.4th at page 879, footnote 3, although the *Favor* court apparently left *Woods* untouched. (*Favor, supra*, 54 Cal.4th at p. 877.) If, as Prado contends, *Chiu* has overruled *Favor* sub silencio, it is equally arguable *Hart's* extension of *Woods* to the context of *attempted* murder has been resurrected sub silencio.

defendants were convicted of second degree murder, but the *Nero* court concluded this was error because an aider and abettor may be found guilty of a lesser homicide-related offense than the actual perpetrator. It concluded the "equally guilty" language for aider and abettor liability can be misleading, and it could not find beyond a reasonable doubt that Brown would have been found guilty of second degree murder in the absence of the erroneous response to the jury's question. (*Id*. at pp. 513-520.)

*Prado's Claim*

Prado argues that, in light of *Woods*, the court sua sponte should have more clearly articulated that the jury had the option of convicting him of either attempted murder *or* attempted voluntary manslaughter as natural and probable consequences of his aiding and abetting an assault with a deadly weapon, regardless of whether the jury concluded Rivas was guilty of the greater offenses. He asserts that if attempted murder was a foreseeable nontarget offense of the target crime (e.g. assault with a deadly weapon) he aided and abetted, attempted voluntary manslaughter was necessarily an equally foreseeable nontarget offense of that target crime. The People argue the jury instructions were adequate but, to the extent the instructions were unclear, any ambiguity was harmless.

*Analysis*

We conclude that, even assuming there was an absence of clarity in the instructional charge to the jury, any deficiency was harmless beyond a reasonable doubt. As a preliminary matter, although Prado asserts all three convictions were infected by this deficiency, the only evidence as to the count involving the attempted murder of Slaughter-Cook was Prado was the sole perpetrator of that attempted murder, which

23

convinces us beyond a reasonable doubt that the jury necessarily convicted Prado of that count because it found he personally possessed the requisite mens rea as to that attempted murder, and therefore we conclude (and Prado offers no argument to the contrary) the vicarious liability principles of the natural and probable consequences doctrine had no impact on that count. Similarly, the evidence supporting the conviction for the attempted murder of Moats again showed Prado was a direct perpetrator of that attempted murder, and he offers no argument or view of the evidence demonstrating how a jury might have concluded Prado personally lacked the intent and premeditation when he first approached to begin his attack (on Moats) but thereafter personally intended and premeditated as he continued his attack on Slaughter-Cook. On this record, we are convinced beyond a reasonable doubt the jury concluded Prado personally possessed the requisite mens rea as to both attempted murders in which he was the direct perpetrator and we are therefore convinced beyond a reasonable doubt the vicarious liability principles (as to which he asserts the instructions were defective) played no role in either of those convictions.

On appeal, the only theory of prejudice Prado attempts to articulate involves his conviction as to count one involving Rivas's attack on Monroe. He argues that, because the prosecutor actually proceeded on the theory of natural and probable consequences, and because the jury could have concluded Prado only intended to aid and abet an assault with a deadly weapon, and could have also concluded Rivas's attempted murder of Monroe was *not* a reasonably foreseeable crime but his attempt to commit voluntary manslaughter on Monroe *was* a reasonably foreseeable crime, the verdict might have been impacted by the imprecision. We are not persuaded by Prado's arguments for

24

several reasons. First, unlike *Samaniego, supra,* 172 Cal.App.4th 1148, the record contains no indication the jury thought Prado was less culpable than Rivas, or wanted to convict Prado of something less than attempted first degree murder but erroneously believed that it could not do so, or made any inquiries indicating it was confused on the point. More importantly, as previously discussed, the prosecutor mentioned the natural and probable consequences doctrine but expressly admonished that it was relying on direct aiding and abetting principles, and focused on Prado's guilt as a direct perpetrator (as to Moats and Slaughter-Cook) and under direct aider and abettor principles (as to Monroe). Moreover, during the prosecutor's brief remarks about the natural and probable consequences doctrine, he did not tell the jury it was barred from convicting Prado of any offense less than any offense of which it found Rivas guilty. Finally, we are convinced the jury found Prado possessed the intent to kill and premeditated that intention because of its verdict as to Slaughter-Cook, which makes it highly likely the jury relied on the direct aiding and abetting principles rather than the natural and probable consequences doctrine.

The entirety of the evidence overwhelmingly proved Prado aided and abetted in the attempted premeditated murder of Monroe. Prado armed himself with a knife and accompanied his friend to extract revenge and, after one of them identified (albeit mistakenly) their target by stating, "That's him in the white blanket," Prado accompanied Rivas to try to repeatedly stab Moats through the blanket, telling him (when Moats claimed they had the wrong person and asked what he had done) that "you did something to my friend." Moreover, when Rivas shifted his attack to Monroe, Prado continued to

25

back Rivas up by stabbing the person who was trying to restrain him.  Considering all of the circumstances, we conclude it is not reasonably possible any ambiguity in the instruction affected the verdict, and therefore the error is harmless beyond a reasonable doubt.  (*Samaniego, supra*, 172 Cal.App.4th at pp. 1165-1166.)

## DISPOSITION

The judgments are affirmed.

McDONALD, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.